1
2
3
4

JOHN ELLIS (No. 59328)
Jellis@ellislegal.com
ELLIS LEGAL P.C.
200 West Madison Street, Suite 2670
Chicago, Illinois 60606
Telephone: (312) 967-7629

5
6

Attorneys for Defendants
BUMBLE INC.
BUZZ HOLDINGS L.P.

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF ILLINOIS

10

EASTERN DIVISION

11

12
13

DARIO DZANANOVIC, individually and on behalf of all others similarly situated,

14

Plaintiff,

15

v.

16
17

BUMBLE, INC. and BUZZ HOLDINGS, L.P.
Defendants.

Case No. _____

**DECLARATION OF JOHN C. ELLIS IN SUPPORT OF DEFENDANTS BUMBLE INC.'S AND BUZZ HOLDINGS L.P.'S NOTICE OF REMOVAL**

[Circuit Court of Cook County Case No. 2021-CH-5967]

18

19
20

I, John C. Ellis, hereby declare as follows:

21
22

1.      I am a member of the Bar of the State of Illinois and the owner of the law

firm of Ellis Legal P.C., counsel of record for Defendants Bumble Inc. and Buzz Holdings

23

L.P. (collectively, "Defendants") in the above-captioned action. I have personal

24

knowledge of the matters set forth below and, if called upon to do so, I could and would

25

testify competently thereto.

26

2.      Attached to this Declaration as **Exhibit A** is a true and correct copy of the

27

civil action filed by Plaintiff Dario Dzananovic, purportedly on behalf of himself and all

28

similarly situated individuals, in the Circuit Court of Cook County, Illinois, entitled *Dario Dzananovic v. Bumble, Inc.*, *et al.*, Case No. 2021-CH-5967.

3.       Attached hereto as **Exhibit B** is a true and correct copy of the Notice of Removal (without exhibits) that was filed in the Circuit Court of Cook County.

I declare under penalty of perjury under the laws of the State of Illinois and the United States that the foregoing is true and correct.

Executed this 30th day of December, 2021 in Chicago, Illinois.

/s/ John Ellis

_____
John Ellis

2

Exhibit A

Hearing Date: 3/24/2022 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
Cook County, IL

FILED
11/24/2021 2:54 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH05967

15736426

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| DARIO DZANANOVIC, individually and on behalf of all others similarly situated, ) | Case No. **2021CH05967** |
| Plaintiff, ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| BUMBLE, INC. and BUZZ HOLDINGS, L.P., ) | |
| Defendants. ) | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Dario Dzananovic ("Dzananovic" or "Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendants Bumble, Inc. and Buzz Holdings, L.P. (collectively, "Bumble" or "Defendants") to put a stop to their unlawful collection, use, and storage of Plaintiff's and putative Class members' sensitive biometric identifiers and biometric information, to have Defendants return or destroy the biometric information that it has retained for years and for which the initial use is no longer pertinent, and to issue a written retention policy, among other things. Plaintiff further seeks statutory damages. Plaintiff, for his Class Action Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, based upon counsel's due diligent investigation, publicly available documents, and conduct and statements of Defendants.

## NATURE OF THE ACTION

1. This action arises from Defendants' unlawful and intentional collection and use of users' biometric information without their consent and subsequent unauthorized disclosure of that information in violation of state law.

2. In 2014, former Tinder founder Whitney Wolfe Herd partnered with Russian-

British billionaire technology entrepreneur Andrey Andreev to create Bumble, a dating app with its mission to end misogyny by empowering women. Bumble is wildly popular and boasts approximately one hundred million registered users worldwide.

3.      Bumble is the dating app that puts the power in women's hands. For a man to be able to contact a woman, she must first have shown interest in him, adding a layer of privacy and safety that other dating services lack.

4.      Bumble shares a lot of the same features as the popular Tinder app, notably the concept of "swiping right" to show your interest in a fellow user. Unlike Tinder, however, women exclusively control the interactions in heterosexual communications on Bumble. Bumble does this because the app is premised on safety and allowing users to control communications and protect their privacy.  Bumble touts the app as part of a movement create a more safe, kind, and accountable internet.

5.      Unbeknownst to its users, however, Defendants use automated software, proprietary algorithms, AI, facial recognition, and other technologies to commercially profit from Plaintiff's and Class Members' personal identifying information and identities, including unique identifying information, biometric data and information, images, geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combinations thereof, as more fully set forth herein.  Bumble harvests this extensive trove of data without the knowledge or consent of its unsuspecting users and shares the collected data with third parties, including the social media companies Facebook and Instagram.

6.      Unbeknownst to its members, the app's photo verification feature scans a user's facial geometry before running an algorithm to verify the user, collecting the user's biometric information.  Separately, the app's "Private Detector" feature, through artificial intelligence,

2

censors lewd content sent privately to users.

7.      Users who registered for or used Bumble and interacted with the app did not consent to Defendants' collection, retention, or release of their biometric information. Because of the app's emphasis on safety and security, Bumble customers trust that their personal information will be maintained in a secure manner and kept from unauthorized disclosure.

8.      Defendants engaged in this conduct without adequately informing impacted individuals, including Plaintiff and members of the proposed class, that their personal information was being collected and potentially disseminated. Worse, Bumble actively concealed the taking of biometric information through the use of "dark patterns" on the app, as described below.

## PARTIES

9.      Plaintiff Dario Dzananovic is a natural person and citizen of the State of Illinois. Dzananovic has been a Bumble user since March 2021.  Plaintiff used the app daily from March 2021 until approximately July 2021, when he deleted Bumble.  Plaintiff re-downloaded Bumble in August 2021 and continues to use the app several times a week. Plaintiff has uploaded approximately six or seven photos of himself to Bumble during this time.

10.      Defendant Bumble Inc., incorporated in Delaware on October 5, 2020, is an American social media company that previously operated the Bumble online dating application. Bumble Inc. maintained its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

11.      Prior to the completion of its initial public offering on February 16, 2021, Bumble Inc. undertook certain reorganization transactions (the "Reorganization Transactions") such that Bumble Inc. is now a holding company, and its sole material asset is a controlling equity interest in Defendant Buzz Holdings L.P. ("Bumble Holdings"). As the general partner of Bumble Holdings, Bumble Inc. now operates and controls all of the business and affairs of Bumble

3

Holdings, has the obligation to absorb losses and receive benefits from Bumble Holdings and, through Bumble Holdings and its subsidiaries, conduct its business.

12. Defendant Bumble Holdings is a Delaware limited partnership which operates the Bumble app. Bumble Holdings maintains its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

## JURISDICTION AND VENUE

13. This Court has personal jurisdiction over Defendants because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from Illinois and specifically Cook County. Defendants collected data directly in Illinois from Plaintiff and Illinois-based users and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information.

14. Defendants' deliberate gathering of Illinois users' biometric information is intentionally targeted toward Illinois residents, including Plaintiff and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois.

15. Venue is proper under 735 ILCS 5/1-108 and 2-101 of the Illinois Code of Civil Procedure, as a substantial portion of the transactions giving rise to the causes of action pleaded herein occurred in Cook County. Specifically, upon information and belief, Defendants' collection a of Plaintiff's and class members' biometric information occurred within Cook County, Illinois.

## FACTUAL BACKGROUND

I. **The Biometric Information Privacy Act**

16. BIPA seeks to safeguard individuals' biometric identifiers and information.

17. Biometric identifiers include a scan of an individual's face geometry. 740 ILCS § 14/10.

4

18.     Biometric information is "any information . . . based on an individual's biometric identifier used to identify an individual."  740 ILCS § 14/10.

19.     Pursuant to BIPA, private entities, such as Defendants, are, among other things: (a) prohibited from collecting, capturing or otherwise obtaining an individual's biometric identifiers and information without providing written notice and obtaining a written release; (b) prohibited from selling, leasing, trading or otherwise profiting from an individual's biometric identifiers and information; (c) prohibited from disclosing, redisclosing or otherwise disseminating an individual's biometric identifiers or information in the absence of circumstances specifically set forth in the statute; and (d) required, to the extent it is in possession of biometric identifiers or information, to develop a written policy, made available to the public, that establishes a retention schedule and guidelines for permanently destroying such identifiers and information.  740 ILCS § 14/15.

20.     BIPA provides for a private right of action and allows a prevailing party to recover liquidated damages in the amount of: (a) $1,000 or actual damages, whichever is greater, for negligent violations of its provisions; and (b) $5,000 or actual damages, whichever is greater, for intentional or reckless violations of its provisions.  740 ILCS § 14/20.  BIPA also allows for the recovery of attorneys' fees and costs and injunctive relief.  740 ILCS § 14/20.

**II.     Defendants Violate the Biometric Information Privacy Act**

*Background on the Bumble App*

21.     Launched in 2014, Bumble is a popular dating app built for women, where women make the first move. It is the second-most popular dating app in the U.S. after Tinder. As of January 2021, the app has a monthly user base of 42 million people.

22.     Users can sign up for Bumble using their phone number or Facebook profile. Early on, Bumble users were required to log in via Facebook when signing up but in April 2018, Bumble

5

added an option to sign up with a phone number only.

23.     For users who sign up with Facebook, information from their account is used to build a profile with photos and personal information, including the user's college and job.

24.     When in the app, users swipe right to "like" a potential match and left to reject them. In heterosexual matches, only female users can make the first contact with matched male users, while in same-sex matches either person can send a message first.

25.     In addition to dating, Bumble offers users the opportunity to develop platonic connections through Bumble BFF for friendships and Bumble Bizz for professional networking and mentorship.

26.     In March 2016, Bumble released BFF mode as a way for users to find platonic friends. After switching into the mode, the app replaces potential dates with people of the user's same sex who are also looking for friends.

27.     In October 2017, the company launched Bumble Bizz which uses a woman-first interface as an attempt to address sexism in business networking.

28.     Bumble BFF and Bumble Bizz have a format similar to the dating app, requiring users to set up profiles and matching users through "yes" and "no" votes, similar to the dating platform.

29.     Bumble represents the app platform to be safe and empowering for women to provide a better dating environment for all users. In Defendants' own words, "Bumble provides opportunities to safely and easily connect with others." See https://bumble.com/en/date (last accessed November 22, 2021).

30.     In April 2016, the Bumble app was updated to combat "ghosting" behavior. As part of the update, if a user is messaged after matching with a potential partner and fails to respond within 24 hours, the match disappears. Before the update, men were allowed unlimited time to

respond to a message from women. This same update was also launched for same-sex matches, with either party allowed to initiate and the other having to respond within 24 hours.

31.     Protecting the identity of its users is at the very heart of the Bumble app. The app's central feature is that only women can initiate a conversation in heterosexual matches, sparing users from the spamming that women often endure on other dating sites.

32.     Bumble is marketed as an app which empowers women to make the first move by giving them the ability to control the conversation thereby allowing users to create "safe and healthy connections."[1]

33.     According to Whitney Wolfe Herd, founder and CEO of Bumble, the app's growth in popularity is owed to the brand's "safety, mission and women first narratives."[2]

***Bumble's Data Collection Practices***

34.     Bumble requires its customers to provide personal identifying information, or "PII," to use the app. It collects, retains, and uses that data to maximize profits through predictive marketing and other targeted marketing practices. By collecting, using, and deriving significant benefit from customers' PII, Bumble had a legal duty to take reasonable steps to protect this information from disclosure.

35.     When a user downloads the app and creates an account, Bumble collects the following information at registration: name; username; email address; mobile number; gender identity; date of birth; sexual preference; photographs; location; and login information for social media accounts connected to Bumble Account (including Facebook and Instagram accounts). Users are required to create a password for their Bumble account during the registration process.

36.     Bumble also collects device information (unique device identifier, device model,

---

[1] See https://bumble.com/en/help/what-is--bumble (last accessed November 22, 2021).
[2] Levi Sumagaysay, Dating App Bumble Blows Past Expectations, Adding Users and Turning a Profit, MarketWatch (May 12, 2021),  available at https://www.marketwatch.com/story/dating-app-bumble-blows-past-expectations-adding-users-and-turning-a-profit-11620852775 (last accessed November 22, 2021).

operating system, and MAC address) from its users along with other sensitive information. If users purchase Bumble's premium services, Bumble processes and retains users' payment information. Bumble also tracks user's interactions with links available on Bumble to third party services and shares click statistics such as how many times a particular link was clicked.

37. With specific respect to biometric identifiers and information, Bumble launched a photo verification tool in September 2016 to ensure that users were the same people in their profile pictures and with the stated goal of protecting users from fake accounts. To be verified, users are asked to submit a selfie in a specific pose. The picture is then reviewed through an automated process. Bumble employees may also conduct a review to ensure the user is the person in the profile pictures.

38. Bumble states that the verification feature is optional but encourages its use. To verify an account, the user taps a "verify" button in their profile. They are then prompted with an example of one of a hundred random photo poses created by Bumble and asked to take a selfie mimicking that pose. After a user's photo is reviewed, they quickly receive a confirmation or rejection of their verification. Users are also encouraged to ask each other to validate their profiles while chatting to make sure that they are talking to real people. Users who are reported as potentially fake are rejected in verification have their profile turned off. If however a user's photo is verified, the user will continue using the app as normal. Photos used for photo verification are not uploaded to the user's profile.



39.     In connection with this facial verification feature, Defendants implemented an artificial intelligence tool that automatically performs facial scans. In doing so, the app extracts geometric data relating to the unique points and contours (i.e., biometric identifiers) of each face, and then uses that data to create a template of each face.

40.     When people upload real selfies to the photo verification feature, the app may take over a minute to analyze the photo and respond with an affirmation or rejection of the photo. However, when faced with photos of a subject other than a human face, the photo verification feature quickly responds with a rejection message. Thus, it is evident that the data is analyzed by an automated system that scans the photo to recognize a face.



41.     In 2017, the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC) released a document providing definitions for biometric information. According to this document, biometric recognition is defined as "automated recognition of individuals based on their biological and behavioural characteristics."[3]

42.     Moreover, the ISO/IEC document adds that "automated recognition implies that a machine based system is used for the recognition either for the full process or assisted by a human being." *Id.*, at § 3.1.3, n.4.  It is evident that Bumble automatically analyzes biometric information

---

[3] *See* https://standards.iso.org/ittf/PubliclyAvailableStandards/c066693_ISO_IEC_2382-37_2017.zip (last accessed November 22, 2021) at § 3.1.3.

here.

**Bumble's Collection of Behavioral Data and Content Moderation**

43.  Bumble "is the first major social platform to embrace behavioral guardrails and content moderation as part of its business model."[4] Defendants leverage "innovative technology solutions to create a more inclusive, safe and accountable way to connect online for all users regardless of gender."[5]

44.  Bumble uses artificial-intelligence technology to conduct content moderation for violations of its app standards like hate speech, even when no users report the behavior. The goal is to identify people who are likely to engage in bad behavior before they do anything.

45.  For example, according to Bumble's Chief Product Officer, Bumble's technology scans profiles for violent images and recognizes at least 700 "stop words" inside of chats. Each time the algorithm uncovers a violation, it is referred to a team of human moderators who then decide whether blocking the user is appropriate. In 2020, Bumble "logged more than 880,000 incidents that violated its guidelines." [6] The company reported that its latest efforts are tailored to address body shaming.[7]

46.  Apart from content moderation, Bumble boasts that its proprietary machine learning capabilities in selecting potential matches for users and determining which users are likely to become paid members and to prevent identity fraud, among other things:

> **Our data and machine learning capabilities:** We are continually analyzing data from user interactions on our platform, allowing us to constantly optimize the user experience. We have machine and deep

---

[4] Charlotte Alter, How Whitney Wolfe Herd Turned a Vision of a Better Internet Into a Billion-Dollar Brand, TIME (Mar. 19, 2021), available at https://time.com/5947727/whitney-wolfe-herd-bumble/ (last accessed November 22, 2021).

[5] See Bumble Inc. Form 10-K for the fiscal year ended 12/ 31/ 20 (the "2020 10-K"), available at https://ir.bumble.com/static-files/6873c49c-1778-4cbc-84ef-27b9d291bd53, at p. 7 (last accessed November 22, 2021).

[6] See Jane Wakefield, The Tech Billionaire Who is Putting Women First, BBC (Apr. 7, 2021), https://www.bbc.com/news/technology-56662100 (last accessed November 22, 2021).

[7] Charlotte Alter, How Whitney Wolfe Herd Turned a Vision of a Better Internet Into a Billion-Dollar Brand, TIME (Mar. 19, 2021), https://time.com/5947727/whitney-wolfe-herd-bumble/(last accessed November 22, 2021).

learning capabilities that we leverage to personalize the potential
matches we display and to inform our product pipeline. We are able to
also target users who are likely to purchase a subscription package or
in-app feature and tailor the experience for them. Our machine and
deep learning posture plays a key role in identity fraud prevention as
well as blocking inappropriate behavior and content from polluting our
platform.

2020 10-K, at 8.

47.     As such, Bumble also automatically analyzes its users' behavioral information

through its use of a matching algorithm which provides recommended potential connections to

the user based on the user's preferences and Bumble's research and analytics concerning and

the user's interactions with the app.

48.     Once users have signed up for the app, they are required to add photos that meet

the app's guidelines. When users upload photos that do not include faces, the app immediately

blocks them and requires the user to upload others. The same is true when users upload photos

of children's faces. To clarify, when users upload pictures of objects or children, the app simply

fails to upload the pictures to the profile and tells the user that there are no relevant matches in

the area.







49.    In some cases, users later receive notifications that their picture has been moderated:



50.    Bumble's machine learning technology also identifies and flags potentially

unwanted lewd images, which Bumble represents as a safety measure. The app's "private detector" artificial intelligence technology detects lewd pictures and blurs them out before recipients see them.

51.     Defendants unlawfully leverage user's PII and private content to improve their artificial intelligence technologies, thereby unjustly increasing their profits and revenues – and Bumble's market value.

52.     Despite its use of facial recognition technology to moderate content and verify users, Bumble denies that it captures or collects biometric information. While the app claims to promote security and transparency, Defendants do not explicitly mention this collection to users.

53.     The app's privacy policy also fails to mention its retention policy regarding PII. And, as detailed below, the app does not require users' consent to its collection of biometric information or to the app's Privacy Policy in general.

***Bumble's Use of Dark Patterns to Avoid Disclosing Data Collection Practices***

54.     Though Bumble's privacy policy appears to contain some disclosures concerning its data collection practices, Bumble does not present these disclosures appropriately to consumers. Plaintiff never received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use his PII, nor did Plaintiff ever sign a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use his personal information and biometric information.

55.     In fact, based on counsel's investigation and analysis, Defendants deliberately designed Bumble's Terms of Service and Privacy Policy to decrease the likelihood that a user will notice and comprehend its terms and conditions or could provide meaningful, express consent, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

56.     Plaintiff did not know nor expect that Defendants would collect, store, and use his

PII and/or biometric information and identifiers when he used the app.

57.     Defendants adopted Terms and Conditions for the app, not seen in the ordinary course by users, which purport to disclose that the app takes some (but not all) of the private and personally identifiable user data and content described above. Bumble's Terms and Conditions, revealed by investigation of counsel but not seen in the ordinary course by users, purport to require arbitration and a class action waiver.

58.     The app does not require that users sign and agree to its Terms and Conditions or its Privacy Policy in order to use the app. It does, however, require that they agree to the app's Guidelines:



59.     Thus, Bumble does not explicitly require app users to agree to the Terms and Conditions or the app's Privacy Policy. Moreover, links to the Terms and Conditions and Privacy

Policy are provided in extremely small letters on the bottom of the app's sign-up page, presented in almost the same hue as the app's background:



60.     Defendants' design practice is termed a Dark Pattern, a user interface designed to trick the user by purposely focus the person's attention on one thing in order to distract their attention from another. Bumble's choice of elusive font and color guarantees that most new users will not notice the presence of Bumble's Terms and Conditions and Privacy Policy on their sign-up page and will thus never read or agree to these terms.

61.     Defendants never provided app users any actual notice of privacy policies or terms of use. Nor do Defendants present users with conspicuously located and designed hyperlinks to their privacy policies and terms of use, much less conspicuous warnings accompanying such hyperlinks. The app thus allows users to utilize it without ever placing them on actual or constructive notice of the privacy policies and terms of use. This lack of actual or constructive notice deprives users of the opportunity to accept or reject Bumble's privacy policies and terms of

use, rendering such documents unenforceable.

62.     Defendants failed to use a reasonable standard of care to protect Plaintiff's and Class Members' biometric identifiers and information from disclosure and, in fact, affirmatively disclosed their biometric identifiers and information.

63.     Particularly concerning are Defendants' publicly announced plans to grow the Bumble community so that Bumble's "marketing learnings" can be shared "across our apps and geographies, which enable the broadest application of successful strategies."[8]

64.     Per the app's hidden Terms and Conditions, Bumble may assign or license users' content to its "affiliates and successors without further approval" of its users.[9]

65.     Defendants collected and stored Plaintiff's personal information and biometric information. Upon information and belief, Defendants have disclosed and/or disseminated these biometric identifiers or biometric information to third parties.

66.     At no point did Plaintiff consent to or authorize Defendants to intercept, record, disclose, or otherwise misuse his personal information or biometric information. Plaintiff would not have registered for or used for Bumble had he known that Defendants engaged in the unlawful actions described herein.

67.     Plaintiff would like to continue to use Bumble in the future but will be uncertain as to whether Defendants have ceased their unlawful practices and violation of his privacy rights without the equitable relief requested herein, specifically an injunction prohibiting Defendants from engaging in the unlawful practices alleged herein. This is particularly the case given the surreptitious nature of Defendants' misconduct.

---

[8] *See* 2020 10-K, at p. 10.
[9] *See* Bumble Terms and Conditions of Use (as of Apr. 28, 2021), available at https://bumble.com/en/terms (last accessed November 22, 2021).

## FRAUDULENT CONCEALMENT AND TOLLING

68. The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct– through, among other things, their hidden and ambiguous privacy policies and terms of use. Plaintiff and the Class were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

69. Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiff and the Class. Defendants are therefore estopped from relying on any statute of limitations.

70. Defendants' fraudulent concealment is common to the Class.

## CLASS ALLEGATIONS

71. Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All citizens of the State of Illinois who, within the applicable statute of limitations, had their biometric information and/or biometric identifiers collected, captured, received, otherwise obtained, or disclosed by Defendants while residing in Illinois.

72. The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

73. **Numerosity:** The exact number of Class members is unknown to Plaintiff at this

time, but it is clear that individual joinder is impracticable. Defendants have collected, captured, received, or otherwise obtained biometric identifiers or biometric information from at least thousands of users who fall into the definition of the Class. Ultimately, the Class members will be easily identified through Defendants' records.

74.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a)  whether Defendant collected, captured, or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

b)  whether Defendant properly informed Plaintiff and the Class of its purposes for collecting, using, and storing their biometric identifiers or biometric information;

c)  whether Defendant obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometric identifiers or biometric information;

d)  whether Defendant has sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

e)  whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction, whichever occurs first; and

f)  whether Defendant complies with any such written policy (if one exists).

75.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex

litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

76.     **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all others available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in their Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## CAUSE OF ACTION

### COUNT I
### Violation of 740 ILCS 14/1, *et seq.*
### (On Behalf of Plaintiff and the Class)

77.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.     Defendants violated BIPA by collecting, capturing, and otherwise obtaining individuals' biometric identifiers and information, including the biometric identifiers and

information of Plaintiff and Class Members, without providing the requisite written information and without obtaining the requisite written releases.

79.     Defendants' violations of BIPA were intentional and reckless or, pleaded in the alternative, negligent.

80.     As a direct and proximate result of Defendants' violations of BIPA, Plaintiff and Class Members have suffered and will continue to suffer injury.

81.     Plaintiff and Class Members seek as monetary relief the greater of $5,000 or actual damages or, pleaded in the alternative, $1,000 or actual damages.

82.     Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that their biometric identifiers and information can be viewed and used by unauthorized persons.  Plaintiff and Class Members have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the misuse of Plaintiffs' and Class Members' biometric identifiers and information.

83.     Plaintiffs and Class Members also seek punitive damages, injunctive relief and the reasonable attorney's fees, costs and expenses relating to this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully requests that the Court enter an Order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as Class Counsel;

B.      Declaring that Defendant's actions, as set out above, violate the BIPA;

C.      Awarding statutory damages for each of Defendant's violations of the BIPA, pursuant to 740 ILCS 14/20(1);

D.      Awarding injunctive and other equitable relief as is necessary to protect the interests

of the Class, including an Order requiring Defendant to collect, store, and use biometric identifiers

or biometric information in compliance with the BIPA;

E.      Awarding Plaintiff and the Class their reasonable litigation expenses and

attorneys' fees;

F.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable; and

G.      Awarding such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Date:  November 24, 2021                    /s/ Katrina Carroll
                                            Katrina Carroll
                                            Kyle A. Shamberg
                                            **LYNCH CARPENTER LLP**
                                            111 W. Washington Street - Suite 1240
                                            Chicago, IL  60602
                                            Phone: (312) 750-1265
                                            Fax: (312) 212-5919
                                            Email:   katrina@lcllp.com
                                                       kyle@lcllp.com
                                            Firm ID No. 63746

                                            **ATTORNEYS FOR PLAINTIFF AND THE
                                            PROPOSED CLASS**

Exhibit B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| DARIO DZANANOVIC, individually and on behalf of similarly situated individuals, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 21-CH-05967 |
| v. | ) ) | |
| BUMBLE, INC. and BUZZ HOLDINGS, L.P. | ) ) | |
| Defendants. | ) | |

## NOTICE TO STATE COURT OF REMOVAL TO FEDERAL COURT

Please take notice that Defendants BUMBLE, INC. AND BUZZ HOLDINGS, L.P. ("DEFENDANTS"), have, on December 30, 2021, filed a Notice of Removal with the Clerk of the United States District for the Northern District of Illinois, to remove the above-referenced cause, No. 21-CH-05967, from the Circuit Court of Cook County to the United States District Court for the Northern District of Illinois. A copy of Defendants' Notice of Removal is attached hereto and marked as "Exhibit A."

Dated: December 30, 2021

Respectfully submitted,

By: /s/ John C. Ellis
Attorney for Defendants

John C. Ellis
ELLIS LEGAL P.C.
200 W. Madison Street, Suite 2670
Chicago, Illinois 60606
(312) 976-7629
jellis@ellislegal.com

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned, an attorney, hereby certifies that on December 30, 2021 a true and correct copy of the foregoing document was served via email, upon the following:

Katrina Carroll
Lynch Carpenter
111 W. Washing Street, Suite 1240
Chicago, IL 60602
katrina@lcllp.com

/s/ John C. Ellis
Attorney for Defendants

John C. Ellis
ELLIS LEGAL P.C.
200 W. Madison Street, Suite 2670
Chicago, Illinois 60606
(312) 976-7629
jellis@ellislegal.com