**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DARIO DZANANOVIC, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 1:21-cv-06925 |
| Plaintiff, | ) ) | Hon. Andrea R. Wood |
| v. | ) ) | Mag. M. David Weisman |
| BUMBLE, INC., BUZZ HOLDINGS, L.P., and BUMBLE TRADING LLC, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT[1]

1.      Plaintiff Dario Dzananovic ("Dzananovic" or "Plaintiff") brings this Amended Class Action Complaint and Demand for Jury Trial against Defendants Bumble, Inc., Buzz Holdings, L.P., and Bumble Trading LLC (collectively, "Bumble" or "Defendants") to put a stop to their unlawful collection, use, and storage of Plaintiff's and putative Class members' sensitive biometric identifiers and biometric information, to have Defendants return or destroy the biometric information that it has retained for years and for which the initial use is no longer pertinent, and to issue a written retention policy, among other things. Plaintiff further seeks statutory damages. Plaintiff, for his Class Action Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, based upon counsel's due diligent investigation, publicly available documents, and conduct and statements of Defendants.

---

[1] Plaintiff filed his original Class Action Complaint in the Circuit Court for Cook County, Illinois. Defendants Bumble, Inc. and Buzz Holdings, L.P., removed the action to the United States District Court for the Northern District of Illinois.

## NATURE OF THE ACTION

2.    This action arises from Defendants' unlawful and intentional collection and use of users' biometric information without their consent and subsequent unauthorized disclosure of that information in violation of state law.

3.    In 2014, former Tinder founder Whitney Wolfe Herd partnered with Russian-British billionaire technology entrepreneur Andrey Andreev to create Bumble, a dating app with its mission to end misogyny by empowering women. Bumble is wildly popular and boasts approximately one hundred million registered users worldwide.

4.    Bumble is the dating app that puts the power in women's hands. For a man to be able to contact a woman, she must first have shown interest in him, adding a layer of privacy and safety that other dating services lack.

5.    Bumble shares a lot of the same features as the popular Tinder app, notably the concept of "swiping right" to show your interest in a fellow user. Unlike Tinder, however, women exclusively control the interactions in heterosexual communications on Bumble. Bumble does this because the app is premised on safety and allowing users to control communications and protect their privacy.  Bumble touts the app as part of a movement create a more safe, kind, and accountable internet.

6.    Unbeknownst to its users, however, Defendants use automated software, proprietary algorithms, AI, facial recognition, and other technologies to commercially profit from Plaintiff's and Class Members' personal identifying information and identities, including unique identifying information, biometric data and information, images, geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combinations thereof, as

more fully set forth herein. Bumble harvests this extensive trove of data without the knowledge or consent of its unsuspecting users and shares the collected data with third parties, including the social media companies Facebook and Instagram.

7.      Users who registered for or used Bumble and interacted with the app did not consent to Defendants' collection, retention, or release of their biometric information. Because of the app's emphasis on safety and security, Bumble customers trust that their personal information will be maintained in a secure manner and kept from unauthorized disclosure.

8.      Defendants engaged in this conduct without adequately informing impacted individuals, including Plaintiff and members of the proposed class, that their personal information was being collected and potentially disseminated. Worse, Bumble actively concealed the taking of biometric information through the use of "dark patterns" on the app, as described below.

## **PARTIES**

9.      Plaintiff Dario Dzananovic is a natural person and citizen of the State of Illinois. Dzananovic has been a Bumble user since March 2021. Plaintiff used the app daily from March 2021 until approximately July 2021, when he deleted Bumble. Plaintiff re-downloaded Bumble in August 2021 and continues to use the app several times a week. Plaintiff has uploaded approximately six or seven photos of himself to Bumble during this time

10.     Defendant Bumble, Inc. ("Bumble Inc."), incorporated in Delaware on October 5, 2020, is an American social media company that previously operated the Bumble online dating application. Bumble Inc. maintained its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

11.     Prior to the completion of its initial public offering on February 16, 2021, Bumble Inc. undertook certain reorganization transactions (the "Reorganization Transactions") such that

Bumble Inc. is now a holding company, and its sole material asset is a controlling equity interest in Defendant Buzz Holdings L.P. ("Bumble Holdings").[2]

12.     As the general partner of Bumble Holdings, Bumble Inc. now operates and controls all of the business and affairs of Bumble Holdings, has the obligation to absorb losses and receive benefits from Bumble Holdings and, through Bumble Holdings and its subsidiaries, conduct its business. Sept. 2021 10-Q, at p. 34.

13.     Bumble Inc. "operates as a single operating segment."[3] Its "chief operating decision maker is the CEO, [Ms. Wolfe Herd,] who reviews financial information presented on a consolidated basis, accompanied by disaggregated information about [Bumble Inc.'s] revenue, for the purpose of making operating decisions, assessing financial performance and allocating resources." *Id.*

14.     Bumble Inc. "provides online dating and social networking platforms though subscription and credit-based products . . . [and] provides these services through websites and applications that it owns and operates." *i.e.*, the Bumble app. Sept. 2021 10-Q, at pp. 12, 34.

15.     Bumble Inc. employs "a global team of software engineers and product managers who drive the development" of the Bumble app platform. 2021 10-K, at p. 8. Bumble Inc. continues "to invest in technology, marketing and product innovation." *Id.* at p. 57. Key investment areas . . . include machine learning capabilities, including improving [its] matching and content moderation technologies; features that enhance trust and safety on [its] platform; new offerings that enhance user engagement and retention; marketing, data analytics, and personalization

---

[2] *See* Bumble Inc. Form 10-Q for the fiscal quarter ended 9/30/2021 (the "Sept. 2021 10-Q"), available at https://ir.bumble.com/static-files/e5297078-0e0f-4559-818d-1b4b93513f8e, at 37 (last accessed Mar. 25, 2022).
[3] *See* Bumble Inc. Form 10-K for the fiscal year ended 12/31/21 (the "2021 10-K"), available at https://ir.bumble.com/static-files/d9c3cdb9-04a8-4f0d-b694-f31741ca7bbd, at 32 (last accessed Mar. 25, 2022).

capabilities; and new subscription and consumable offerings to drive incremental value to Paying Users." *Id.*

16.     Bumble Inc. monetizes the Bumble app via "a freemium model where the use of [its] services is free and a subset of [its] users pay for subscriptions or in-app purchases to access premium features." Sept. 2021 10-Q, at p. 38. Bumble Inc. primarily derives its revenue from the purchase and/or renewal of Bumble app subscriptions and in-app purchases, generating $142.5 million in revenue in the third quarter of 2021 alone. *Id.* 14. However, Bumble Inc.'s revenue is offset by a number of expenses, including "selling and marketing expense consist[ing] primarily of brand marketing" and "[p]roduct development expenses consisting primarily of compensation . . . for personnel engaged in the design, development, testing and enhancement of product offerings and related technology." 2021 10-K, at pp. 61–62.

17.     Bumble Inc. acquires new Bumble app users "through investments in marketing and brand." 2021 10-K, at p. 56.  Bumble Inc. converts new app users to "Paying Users by introducing premium features which maximize the probability of developing meaningful connections and improving their experience." *Id.*

18.     Bumble Inc. "regularly review[s] a number of metrics," including the number of Bumble app paying users and the average revenue per Bumble app paying user to "measure [its] performance, identify trends in [its] business, prepare financial projections, and make strategic decisions." Sept. 2021 10-Q, at p. 35.

19.     Bumble Inc. directs and controls the operations of Defendant Bumble Trading LLC ("Bumble Trading"), who is responsible for the marketing and advertising of the Bumble app in the United States. The Chief Executive Officer ("CEO") of Bumble Inc., Ms. Wolfe Herd, is a director of Bumble Trading, the President of Bumble Inc., Mr. Tariq Shaukat, is employed as the

President of Bumble Trading, and the Chief Financial Officer of Bumble Inc., Ms. Anuradha Subramanian, is employed as the Chief Financial Officer of Bumble Trading, with Bumble Inc. being the ultimate parent company of Bumble Trading.

20.     Bumble Inc. directs and controls the operations of Bumble Holding Limited, a United Kingdom corporation, who owns the rights to the Bumble trademarks, domain names, user data, and other data from the Bumble app, and who is responsible for distributing the Bumble app on the Apple App Store and Google Play Store in the United States. Ms. Wolfe Herd and Mr. Shaukat formerly served as directors of Bumble Holding Limited until March 2022. Upon information and belief, Ms. Wolfe Herd serves as the CEO of Bumble Holding Limited. Bumble Inc. is designated as a person with significant control of Bumble Holding Limited, holding 75% or more or the voting rights in Bumble Holding Limited, with Bumble Inc. being the ultimate parent company of Bumble Holding Limited.

21.     Bumble Inc., Bumble Trading, and Bumble Holding Limited are parties to the Bumble app's terms and conditions, entered into with users of the Bumble app, while Bumble Trading and Bumble Holding Limited are parties to the Bumble app's privacy policy, entered into with users of the Bumble app.

22.     Defendant Bumble Holdings is a Delaware limited partnership which operates the Bumble app. Bumble Holdings maintains its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

23.     The CEO of Bumble Inc., Ms. Wolfe Herd, is the CEO of Bumble Holdings, and serves on the board of directors of the general partner of Bumble Holdings.

24.     Defendant Bumble Trading is a Delaware limited liability company, responsible for the marketing and advertising of the Bumble app. Bumble Trading is a controller of personal

information collected and processed through the Bumble app. Bumble Trading maintains its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants.

26.     This Court has personal jurisdiction over Defendants because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from Illinois and specifically this District. Defendants collected data directly in Illinois from Plaintiff and Illinois-based users and exposed residents of Illinois to ongoing privacy risks within Illinois and this District based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information.

27.     Furthermore, through the Bumble app, Defendants actively collect information harvested from the Illinois-based devices of Illinois residents.

28.     Defendants collect biometric identifiers from Illinois residents who use the Bumble app. From time to time, Defendants require Bumble app users in Illinois to verify themselves by providing Defendants with a photo of themselves, which Defendants compare to the user's profile pictures and then store on their systems.[4]

29.     Defendants' collection of Illinois residents' biometric identifiers is by deliberate and intentional design. Defendants collect photos of Illinois residents' and verify their identities

---

[4] *See Profile Verification*, Bumble, available at https://bumble.com/help/how-can-i-verify-my-profile#:~:text=We%20use%20an%20automated%20process,ve%20uploaded%20onto%20the%20app (last accessed Mar. 25, 2022).

as a "promise that the person you're talking with is who they say they are, so you can keep on swiping and dating with confidence."[5] Defendants even tout that "Bumble is the first app in the U.S. in its space with this catfish-catching technology!" *Id.*

30.     Defendants also collect "location information" from Illinois-based devices of Illinois residents by harvesting the devices' GPS data and Wi-Fi information each time the Bumble app is opened on an Illinois-based device.

31.     Defendants use the collected location information to update and display the name of the device user's current city and the device user's distance from other Bumble app users when the user's device launches the Bumble app.[6]

32.     Defendants' collection of Illinois residents' user location information is deliberate and intentional by design. If a user does not grant Defendants' permission to collect the user device's location information, the Bumble app is effectively worthless as a user will be unable to be seen by other users, swipe on other users, or match with other users.[7]

33.     Defendants' deliberate gathering of Illinois users' biometric information and location information is intentionally targeted toward Illinois residents, including Plaintiff and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois and this District.

34.     In addition, Defendants primarily derive revenue from subscription and in-app purchases to use the Bumble app's premium features. In the third quarter of 2021, Defendants had 1.5 million Bumble app paying users, generating average revenue of $30.99 per paying user.

---

[5] *See How to Get Verified on Bumble*, Bumble, available at https://bumble.com/en-us/the-buzz/the-end-of-catfishing-introducing-photo-verification (last accessed Mar. 25, 2022).

[6] *See* Nicole Campbell, *All You Need to Know about How Does Bumble Location Work*, iToolab, available https://itoolab.com/location/how-does-bumble-location-work/ (last accessed Mar. 25, 2022).

[7] *See How Does Bumble Work?*, Bumble, available at https://bumble.com/en/help/can-i-use-bumble-without-location-permissions (last accessed Mar. 25, 2022).

Bumble Inc. Sept. 2021 10-Q, at p. 35. Upon information and belief, Defendants generate revenue from thousands of paying users who reside in Illinois, including this District.

35.     By deriving revenue from Illinois residents, this constitutes purposeful activity directed at devices and individuals in Illinois and this District.

36.     In addition, Defendants encourage residents of Illinois and this District to use the Bumble app by touting their photo verification feature to potential Illinois-based users: "Now you can flirt, connect, and network comfortably, knowing the person you're talking to is exactly who they say they are."[8] Indeed, upon information and belief, Defendants expressly target their advertisements by state, including within Illinois and this District, in order to gain brand awareness and encourage Illinois residents to use the Bumble app.

37.     On April 24, 2018, Defendants co-hosted a recruiting and networking event with WeWork in Chicago, Illinois so attendees could "[c]onnect with companies looking to hire talented individuals in Chicago."[9] At the event, Defendants offered attendees "[h]air and makeup touchups . . . [f]ollowed by a professional headshot to update [app users'] Bumble Bizz profile[s]!" *Id.*

38.     On October 2, 2018, Defendants Sponsored "Chicago – BuzzWild: Social Game Night Presented by Bumble" in Chicago, Illinois.[10] Attendees "[e]njoy[ed] a buzz-worthy evening presented by Bumble . . . ." *Id.*

39.     In November 2018, Defendants created an offline venture called a "BumbleSpot." "A BumbleSpot is a Bumble-verified physical location—be it a bar, a restaurant, or a coffee

---

[8] *See How to Use Bumble's Photo Verification Feature*, Bumble, available at https://bumble.com/en-us/the-buzz/request-verification (last accessed Mar. 25, 2022).
[9] *See Chicago – Recruiting and Networking*, The Beehive, available at https://thebeehive.bumble.com/new-events/chicago-recruiting-and-networking (last accessed Mar. 25, 2022).
[10] *See Chicago – BuzzWild: Social Game Night Presented by Bumble*, The Beehive, available at https://thebeehive.bumble.com/new-events/chicago-buzzwild-social-game-night-presented-by-bumble (last accessed Mar. 25, 2022).

shop—where people can meet and mingle safely."[11] Since launching BumbleSpot, Defendants have rolled out 80 locations in major cities across the United States and Canada, including Chicago. *Id.*

40.     "Bumble [] joined forces with Marriott International's playful, millennial-focused brand Moxy Hotels to launch 'BumbleSpot #atthemoxy' — fun, interactive locations at select Moxy Hotels across the country where users can bring their match from the digital sphere to real life."[12] Defendants hosted a "BumbleSpot #attheMoxy" at the Moxy Hotel in Chicago, Illinois on Nov. 15, 2018.[13]

41.     On February 7, 2019, Defendants offered "Chicago – Dining Out Chicago Passbook" to Bumble app users in Chicago, Illinois: "Bumble Chicago users can now receive 2for1 DiningOut Passbooks with code **'BUMBLECHI19'** for the whole 2019 year!"[14]

42.     On November 21, 2019, Defendants hosted a "Chicago Happy Hour" in Chicago, Illinois; providing a free drink to attendees who showed their Bumble profile when they arrived.[15]

43.     Later in 2021, Defendants teamed up with Fever, a global entertainment discovery platform "to give away some of the best dates that Chicago[, Illinois] has to offer every week."[16] When contestants entered the weekly drawing with Defendants, they were given a chance to win

---

[11] *See* Berenice Magistretti, *BumbleSpot helps you meet your matches IRL*, Daily Dot, available at https://www.dailydot.com/[irl/what-is-bumblespot-bumble/ (last updated May 20, 2021).

[12] *See Introducing BumbleSpot #atthemoxy*, The Beehive, available at https://thebeehive.bumble.com/bumblespot (last accessed March 25, 2022).

[13] *See* Erica Sweeney, *Marriott's Moxy Hotels and Bumble app blend digital, real life connections*, Dive/Wire, available at https://www.marketingdive.com/news/marriotts-moxy-hotels-and-bumble-app-blend-digital-real-life-connections/541803/ (Nov. 9, 2018).

[14] *See Chicago – Dining Out Chicago Passbook*, The Beehive, available at https://thebeehive.bumble.com/new-events/chicago-dining-out-chicago-passbook (last accessed Mar. 25, 2022).

[15] *See Chicago Happy Hour,* The Beehive, available at https://thebeehive.bumble.com/new-events/chicago-happy-hour (last accessed Mar. 25, 2022).

[16] *See Bumble & Fever Are Giving Away Epic Date Experiences This Summer*, Secret Chicago, available at https://secretchicago.com/bumble-dating-experiences/ (lasted updated Aug. 5, 2021).

a grand prize date experienced that "include[d] a private sunset sail for two on Lake Michigan with stunning views of Chicago's skyline, followed by a romantic meal at a Michelin-starred Next restaurant." *Id.*

44. Defendants advertise the Bumble app using Billboards in Chicago, Illinois.[17]



45. In July 2021 Defendants sponsored a booth—the "Bumble Hive at Lollapalooza" in Grant Park, Chicago Illinois. Defendants provided guests with Bumble merchandise, and a place to "fill their water bottles . . . , charge their phones or lounge with their friends."[18]

[17] *See* Kasey Brown, *Bumble*, Queso Brownie, available at https://www.quesobrownie.com/bumblem (last visited Mar. 25, 2022).
[18] *See Bumble Hive Lollapalooza*, The Vendry, available at https://thevendry.com/events/40500/bumble-hive-lollapalooza-chicago (last visited March 25, 2022).





46.     Defendants will again sponsor their Bumble Hive at Lollapalooza in Grant Park, Chicago, Illinois on July 28-31, 2022.[19]

47.     In August 2021, Defendants sponsored events at Whispers at Oak Street Beach, in Chicago, Illinois, advertising that "dating IRL is back."[20]

---

[19] *See Around the Park,* Lollapalooza, available at https://www.lollapalooza.com/around-the-park (last accessed March 25, 2022).
[20] *See* https://www.facebook.com/WhispersOakStreet/ (last visited Mar. 25, 2022).

 **Whispers At Oak Street Beach** is at **Oak Street Beach**.

Aug 6, 2021 · Chicago, Illinois · 🌐

Dating IRL is back… Finally! Come check out the @Bumble Cabana Takeover this Saturday, August 7th from 12pm-10pm! All are welcome! 😍💛



 **Whispers At Oak Street Beach** is in **Chicago, Illinois**.

Aug 7, 2021 · Chicago, Illinois · 🌐

@bumble Cabana Takeover is TODAY from 12pm-10pm at @whispers_oakstreetbeach! Bring your friends and get your mingle on 💛



 **Whispers At Oak Street Beach** is at **Whispers At Oak Street Beach**.

Aug 12, 2021 · Chicago, Illinois · 🌐

@bumble sponsored Happy Hour TODAY (Thursday) from 6-9pm at Whispers at Oak Street Beach's own Bumble Bar! See you at the beach 🏖️

 **Whispers At Oak Street Beach** is at **Oak Street Beach**.

Aug 20, 2021 · Chicago, Illinois · 🌐

Join us on the beach for one last @bumble Cabana Takeover this Saturday, August 21 from 12pm-10pm at @whispers_oakstreetbeach!



48.     Defendants regularly promote and advertise "success stories" of couples and friends who met on the Bumble app in Chicago, Illinois. [21]

49.     Finally, Defendants employ campus ambassadors, called "Honeys" to market and promote the Bumble app on their respective college campuses. Honeys are "given the creative freedom to bring Bumble to life on their campuses through exciting events, creative students, and more."[22] Honeys can "[n]egotiate partnerships, host events, and align Bumble with [their] surrounding community using localized marketing tactics." *Id.*

50.     Upon and information belief, Defendants employ Honeys at the University of Chicago, the University of Illinois at Urbana-Champaign, Loyola University of Chicago, and Northwestern University to plan events around theses campuses in order to promote the Bumble app on these college campuses.

51.     Defendants' deliberate marketing and advertising campaigns are intentionally targeted at Illinois residents, including residents of this District, and constitutes purposeful activity directed at devices and individuals in Illinois and this District.

52.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

---

[21] *See* Sara Gaynes Levy*, Iena Though Rob Wouldn't Stick Around While She Recovered From Major Surgery. He Proved Her Wrong*, The Beehive, available at  https://bumble.com/the-buzz/bumble-success-story-iena-rob (last accessed Mar. 25, 2022); *From Awkward Texts to a Walk Down the Aisle*, The Beehive, available at  https://bumble.com/the-buzz/bumble-success-story-chicago-love-story (last accessed Mar. 25, 2022); *Bumble Success Tory: Megha and David*, The Beehive, available at  https://bumble.com/en/the-buzz/bumble-success-story-megha-david (last accessed Mar. 25, 2022); *Bumble BFF Success Story: Chicago Social*, The Beehive, available at https://bumble.com/en/the-buzz/success-story-bff-chicago (last visited Mar. 25, 2022).
[22] *See Ambassadors,* Bumble, available at https://thebeehive.bumble.com/ambassadors-bumble-honey (last accessed Mar. 25, 2022).

## FACTUAL BACKGROUND

**I.      The Biometric Information Privacy Act**

53.      BIPA seeks to safeguard individuals' biometric identifiers and information.

54.      Biometric identifiers include a scan of an individual's face geometry.  740 ILCS § 14/10.

55.      Biometric information is "any information . . . based on an individual's biometric identifier used to identify an individual."  740 ILCS § 14/10.

56.      Pursuant to BIPA, private entities, such as Defendants, are, among other things: (a) prohibited from collecting, capturing or otherwise obtaining an individual's biometric identifiers and information without providing written notice and obtaining a written release; (b) prohibited from selling, leasing, trading or otherwise profiting from an individual's biometric identifiers and information; (c) prohibited from disclosing, redisclosing or otherwise disseminating an individual's biometric identifiers or information in the absence of circumstances specifically set forth in the statute; and (d) required, to the extent it is in possession of biometric identifiers or information, to develop a written policy, made available to the public, that establishes a retention schedule and guidelines for permanently destroying such identifiers and information.  740 ILCS § 14/15.

57.      BIPA provides for a private right of action and allows a prevailing party to recover liquidated damages in the amount of: (a) $1,000 or actual damages, whichever is greater, for negligent violations of its provisions; and (b) $5,000 or actual damages, whichever is greater, for intentional or reckless violations of its provisions.  740 ILCS § 14/20.  BIPA also allows for the recovery of attorneys' fees and costs and injunctive relief.  740 ILCS § 14/20.

**II.       Defendants Violate the Biometric Information Privacy Act**

*Background on the Bumble App*

58.      Launched in 2014, Bumble is a popular dating app built for women, where women make the first move. It is the second-most popular dating app in the U.S. after Tinder. As of January 2021, the app has a monthly user base of 42 million people.

59.      Users can sign up for Bumble using their phone number or Facebook profile. Early on, Bumble users were required to log in via Facebook when signing up but in April 2018, Bumble added an option to sign up with a phone number only.

60.      For users who sign up with Facebook, information from their account is used to build a profile with photos and personal information, including the user's college and job.

61.      When in the app, users swipe right to "like" a potential match and left to reject them. In heterosexual matches, only female users can make the first contact with matched male users, while in same-sex matches either person can send a message first.

62.      In addition to dating, Bumble offers users the opportunity to develop platonic connections through Bumble BFF for friendships and Bumble Bizz for professional networking and mentorship.

63.      In March 2016, Bumble released BFF mode as a way for users to find platonic friends. After switching into the mode, the app replaces potential dates with people of the user's same sex who are also looking for friends.

64.      In October 2017, the company launched Bumble Bizz which uses a woman-first interface as an attempt to address sexism in business networking.

65.      Bumble BFF and Bumble Bizz have a format similar to the dating app, requiring users to set up profiles and matching users through "yes" and "no" votes, similar to the dating

platform.

66.     Bumble represents the app platform to be safe and empowering for women to provide a better dating environment for all users. In Defendants' own words, "Bumble provides opportunities to safely and easily connect with others." *See* https://bumble.com/en/date (last accessed November 22, 2021).

67.     In April 2016, the Bumble app was updated to combat "ghosting" behavior. As part of the update, if a user is messaged after matching with a potential partner and fails to respond within 24 hours, the match disappears. Before the update, men were allowed unlimited time to respond to a message from women. This same update was also launched for same-sex matches, with either party allowed to initiate and the other having to respond within 24 hours.

68.     Protecting the identity of its users is at the very heart of the Bumble app. The app's central feature is that only women can initiate a conversation in heterosexual matches, sparing users from the spamming that women often endure on other dating sites.

69.     Bumble is marketed as an app which empowers women to make the first move by giving them the ability to control the conversation thereby allowing users to create "safe and healthy connections."[23]

70.     According to Whitney Wolfe Herd, founder and CEO of Bumble, the app's growth in popularity is owed to the brand's "safety, mission and women first narratives."[24]

***Bumble's Data Collection Practices***

71.     Bumble requires its customers to provide personal identifying information, or

---

[23] *See* https://bumble.com/en/help/what-is--bumble (last accessed November 22, 2021).
[24] Levi Sumagaysay, Dating App Bumble Blows Past Expectations, Adding Users and Turning a Profit, MarketWatch (May 12, 2021), available at https://www.marketwatch.com/story/dating-app-bumble-blows-past-expectations-adding-users-and-turning-a-profit-11620852775 (last accessed November 22, 2021).

"PII," to use the app. It collects, retains, and uses that data to maximize profits through predictive marketing and other targeted marketing practices. By collecting, using, and deriving significant benefit from customers' PII, Bumble had a legal duty to take reasonable steps to protect this information from disclosure.

72.     When a user downloads the app and creates an account, Bumble collects the following information at registration: name; username; email address; mobile number; gender identity; date of birth; sexual preference; photographs; location; and login information for social media accounts connected to Bumble Account (including Facebook and Instagram accounts). Users are required to create a password for their Bumble account during the registration process.

73.     Bumble also collects device information (unique device identifier, device model, operating system, and MAC address) from its users along with other sensitive information.  If users purchase Bumble's premium services, Bumble processes and retains users' payment information. Bumble also tracks user's interactions with links available on Bumble to third party services and shares click statistics such as how many times a particular link was clicked.

74.     With specific respect to biometric identifiers and information, Bumble launched a photo verification tool in September 2016 to ensure that users were the same people in their profile pictures and with the stated goal of protecting users from fake accounts. To be verified, users are asked to submit a selfie in a specific pose. The picture is then reviewed through an automated process. Bumble employees may also conduct a review to ensure the user is the person in the profile pictures.

75.     Bumble states that the verification feature is optional but encourages its use. To verify an account, the user taps a "verify" button in their profile. They are then prompted with an example of one of a hundred random photo poses created by Bumble and asked to take a selfie

mimicking that pose. After a user's photo is reviewed, they quickly receive a confirmation or rejection of their verification. Users are also encouraged to ask each other to validate their profiles while chatting to make sure that they are talking to real people. Users who are reported as potentially fake are rejected in verification have their profile turned off. If however a user's photo is verified, the user will continue using the app as normal. Photos used for photo verification are not uploaded to the user's profile.



76. In connection with this facial verification feature, Defendants implemented an artificial intelligence tool that automatically performs facial scans. In doing so, the app extracts geometric data relating to the unique points and contours (i.e., biometric identifiers) of each face, and then uses that data to create a template of each face.

77. When people upload real selfies to the photo verification feature, the app may take over a minute to analyze the photo and respond with an affirmation or rejection of the photo. However, when faced with photos of a subject other than a human face, the photo verification

feature quickly responds with a rejection message. Thus, it is evident that the data is analyzed by an automated system that scans the photo to recognize a face.



78.     In 2017, the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC) released a document providing definitions for biometric information. According to this document, biometric recognition is defined as "automated recognition of individuals based on their biological and behavioural characteristics."[25]

---

[25]    *See*    https://standards.iso.org/ittf/PubliclyAvailableStandards/c066693_ISO_IEC_2382-37_2017.zip (last accessed November 22, 2021) at § 3.1.3.

79.     Moreover, the ISO/IEC document adds that "automated recognition implies that a machine based system is used for the recognition either for the full process or assisted by a human being." *Id*., at § 3.1.3, n.4.  It is evident that Bumble automatically analyzes biometric information here.

***Bumble's Collection of Behavioral Data and Content Moderation***

80.     Bumble "is the first major social platform to embrace behavioral guardrails and content moderation as part of its business model."[26] Defendants leverage "innovative technology solutions to create a more inclusive, safe and accountable way to connect online for all users regardless of gender."[27]

81.     Bumble uses artificial-intelligence technology to conduct content moderation for violations of its app standards like hate speech, even when no users report the behavior. The goal is to identify people who are likely to engage in bad behavior before they do anything.

82.     For example, according to Bumble's Chief Product Officer, Bumble's technology scans profiles for violent images and recognizes at least 700 "stop words" inside of chats. Each time the algorithm uncovers a violation, it is referred to a team of human moderators who then decide whether blocking the user is appropriate. In 2020, Bumble "logged more than 880,000 incidents that violated its guidelines." [28] The company reported that its latest efforts are tailored to

---

[26] Charlotte Alter, How Whitney Wolfe Herd Turned a Vision of a Better Internet Into a Billion-Dollar Brand, TIME (Mar. 19, 2021), available at https://time.com/5947727/whitney-wolfe-herd-bumble/ (last accessed November 22, 2021).
[27] *See* Bumble Inc. Form 10-K for the fiscal year ended 12/ 31/ 20 (the "2020 10-K"), available at https://ir.bumble.com/static-files/6873c49c-1778-4cbc-84ef-27b9d291bd53, at p. 7 (last accessed November 22, 2021).
[28] *See* Jane Wakefield, *The Tech Billionaire Who is Putting Women First*, BBC (Apr. 7, 2021), https://www.bbc.com/news/technology-56662100 (last accessed November 22, 2021).

address body shaming.[29]

83.     Apart from content moderation, Bumble boasts that its proprietary machine learning capabilities in selecting potential matches for users and determining which users are likely to become paid members and to prevent identity fraud, among other things:

> **Our data and machine learning capabilities:** We are continually analyzing data from user interactions on our platform, allowing us to constantly optimize the user experience. We have machine and deep learning capabilities that we leverage to personalize the potential matches we display and to inform our product pipeline. We are able to also target users who are likely to purchase a subscription package or in-app feature and tailor the experience for them. Our machine and deep learning posture plays a key role in identity fraud prevention as well as blocking inappropriate behavior and content from polluting our platform.

2020 10-K, at 8.

84.     As such, Bumble also automatically analyzes its users' behavioral information through its use of a matching algorithm which provides recommended potential connections to the user based on the user's preferences and Bumble's research and analytics concerning and the user's interactions with the app.

85.     Once users have signed up for the app, they are required to add photos that meet the app's guidelines. When users upload photos that do not include faces, the app immediately blocks them and requires the user to upload others. The same is true when users upload photos of children's faces. To clarify, when users upload pictures of objects or children, the app simply fails to upload the pictures to the profile and tells the user that there are no relevant matches in the area.

---

[29] Charlotte Alter, How Whitney Wolfe Herd Turned a Vision of a Better Internet Into a Billion-Dollar Brand, TIME (Mar. 19, 2021), https://time.com/5947727/whitney-wolfe-herd-bumble/(last accessed November 22, 2021).







86.     In some cases, users later receive notifications that their picture has been moderated:



87.     Bumble's machine learning technology also identifies and flags potentially

unwanted lewd images, which Bumble represents as a safety measure. The app's "private detector" artificial intelligence technology detects lewd pictures and blurs them out before recipients see them.

88.     Defendants unlawfully leverage user's PII and private content to improve their artificial intelligence technologies, thereby unjustly increasing their profits and revenues – and Bumble's market value.

89.     Despite its use of facial recognition technology to moderate content and verify users, Bumble denies that it captures or collects biometric information. While the app claims to promote security and transparency, Defendants do not explicitly mention this collection to users.

90.     The app's privacy policy also fails to mention its retention policy regarding PII. And, as detailed below, the app does not require users' consent to its collection of biometric information or to the app's Privacy Policy in general.

***Bumble's Use of Dark Patterns to Avoid Disclosing Data Collection Practices***

91.     Though Bumble's privacy policy appears to contain some disclosures concerning its data collection practices, Bumble does not present these disclosures appropriately to consumers. Plaintiff never received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use his PII, nor did Plaintiff ever sign a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use his personal information and biometric information.

92.     In fact, based on counsel's investigation and analysis, Defendants deliberately designed Bumble's Terms of Service and Privacy Policy to decrease the likelihood that a user will notice and comprehend its terms and conditions or could provide meaningful, express consent, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

93.     Plaintiff did not know nor expect that Defendants would collect, store, and use his PII and/or biometric information and identifiers when he used the app.

94.     Defendants adopted Terms and Conditions for the app, not seen in the ordinary course by users, which purport to disclose that the app takes some (but not all) of the private and personally identifiable user data and content described above. Bumble's Terms and Conditions, revealed by investigation of counsel but not seen in the ordinary course by users, purport to require arbitration and a class action waiver.

95.     The app does not require that users sign and agree to its Terms and Conditions or its Privacy Policy in order to use the app. It does, however, require that they agree to the app's Guidelines:



96.     Thus, Bumble does not explicitly require app users to agree to the Terms and Conditions or the app's Privacy Policy. Moreover, links to the Terms and Conditions and Privacy

Policy are provided in extremely small letters on the bottom of the app's sign-up page, presented in almost the same hue as the app's background:



97.     Defendants' design practice is termed a Dark Pattern, a user interface designed to trick the user by purposely focus the person's attention on one thing in order to distract their attention from another. Bumble's choice of elusive font and color guarantees that most new users will not notice the presence of Bumble's Terms and Conditions and Privacy Policy on their sign-up page and will thus never read or agree to these terms.

98.     Defendants never provided app users any actual notice of privacy policies or terms of use. Nor do Defendants present users with conspicuously located and designed hyperlinks to their privacy policies and terms of use, much less conspicuous warnings accompanying such hyperlinks. The app thus allows users to utilize it without ever placing them on actual or constructive notice of the privacy policies and terms of use. This lack of actual or constructive

notice deprives users of the opportunity to accept or reject Bumble's privacy policies and terms of use, rendering such documents unenforceable.

99.     Defendants failed to use a reasonable standard of care to protect Plaintiff's and Class Members' biometric identifiers and information from disclosure and, in fact, affirmatively disclosed their biometric identifiers and information.

100.    Particularly concerning are Defendants' publicly announced plans to grow the Bumble community so that Bumble's "marketing learnings" can be shared "across our apps and geographies, which enable the broadest application of successful strategies."[30]

101.    Per the app's hidden Terms and Conditions, Bumble may assign or license users' content to its "affiliates and successors without further approval" of its users.[31]

102.    Defendants collected and stored Plaintiff's personal information and biometric information. Upon information and belief, Defendants have disclosed and/or disseminated these biometric identifiers or biometric information to third parties.

103.    At no point did Plaintiff consent to or authorize Defendants to intercept, record, disclose, or otherwise misuse his personal information or biometric information. Plaintiff would not have registered for or used for Bumble had he known that Defendants engaged in the unlawful actions described herein.

104.    Plaintiff would like to continue to use Bumble in the future but will be uncertain as to whether Defendants have ceased their unlawful practices and violation of his privacy rights without the equitable relief requested herein, specifically an injunction prohibiting Defendants from engaging in the unlawful practices alleged herein. This is particularly the case given the

---

[30] *See* 2020 10-K, at p. 10.
[31] *See* Bumble Terms and Conditions of Use (as of Apr. 28, 2021), available at https://bumble.com/en/terms (last accessed November 22, 2021).

surreptitious nature of Defendants' misconduct.

### DEFENDANTS' BELATED AMENDMENTS TO ITS PRIVACY POLICY

105.     Even if users did have actual or constructive notice of Bumble's privacy policy (they do not), Defendants' belated amendments further underscore its efforts to hide Bumble's collection of biometric data from its users.

106.     Prior to the filing of Plaintiff's Class Action Complaint on November 11, 2021, Bumble's privacy policy did not advise of its biometric collection practice. In fact, it disclaimed it, stating that its inclusion of "biometric information" in the California Consumer Privacy Act ("CCPA")'s definition of personal information was "not relevant here."[32] Bumble's discussion of its "Profile Verification Information" also excluded any mention of the biometric data it captured.

107.     On December 12, 2021, approximately a month after Plaintiff filed his Class Action Complaint, Bumble amended its Privacy Policy to, among other things, retitle the discussion of its profile verification procedures as "Profile Verification Information (Including Biometric Information)," and including a new paragraph stating:

> If you choose to verify your profile photo, we will scan each photo that you submit. The scan may include the use of facial recognition technology so that we can compare the photo you submit to your profile photo, to help ensure that you are who you say you are. We do not add the verification photos to your profile. We retain the scans so that we can verify you in the future and for our record-keeping purposes until we no longer need them for such purposes or for three years after your last interaction with us, whichever occurs first. After the applicable retention period expires, we take commercially reasonable steps to permanently and securely delete the scans from our systems.[33]

---

[32]  *See* Bumble Privacy Policy (as of November 24, 2021), available at https://web.archive.org/web/20211124055948/https://bumble.com/en/privacy (last accessed March 25, 2022).

[33]  *See* Bumble Privacy Policy (as of December 21, 2021), available at https://web.archive.org/web/20220215221814/https://bumble.com/en/privacy (last accessed March 25, 2022).

108.     Bumble's December 12, 2021 amendments to its privacy policy also included, for the first time, reference to biometric information in its discussion of data retention and deletion.

109.     On March 7, 2022, Bumble further amended its privacy policy.  Those amendments included, *inter alia*, omission of its prior disclaimer that reference to biometric information was "not relevant here."[34]

## FRAUDULENT CONCEALMENT AND TOLLING

110.     The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct– through, among other things, their hidden and ambiguous privacy policies and terms of use. Plaintiff and the Class were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

111.     Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiff and the Class. Defendants are therefore estopped from relying on any statute of limitations.

112.      Defendants' fraudulent concealment is common to the Class.

## CLASS ALLEGATIONS

113.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All citizens of the State of Illinois who, within the applicable statute of limitations, had their biometric information and/or biometric identifiers collected, captured, received, otherwise obtained, or disclosed by Defendants while residing in Illinois.

114.     The following people are excluded from the Class: (1) any judge or magistrate

---

[34] *See* Bumble Privacy Policy (as of March 7, 2022), available at https://bumble.com/en/privacy (last accessed March 25, 2022).

presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

115.    **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. Defendants have collected, captured, received, or otherwise obtained biometric identifiers or biometric information from at least thousands of users who fall into the definition of the Class. Ultimately, the Class members will be easily identified through Defendants' records.

116.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

   a)    whether Defendants collected, captured, or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

   b)    whether Defendants properly informed Plaintiff and the Class of its purposes for collecting, using, and storing their biometric identifiers or biometric information;

   c)    whether Defendants obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometric identifiers or biometric information;

d)      whether Defendants have sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

e)      whether Defendants developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction, whichever occurs first; and

f)      whether Defendants comply with any such written policy (if one exists).

117.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

118.    **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all others available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase

the delay and expense to all parties due to the complex legal and factual controversies presented in their Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**CAUSE OF ACTION**

**COUNT I**
**Violation of 740 ILCS 14/1,** *et seq.*
**(On Behalf of Plaintiff and the Class)**

119.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

120.    Defendants violated BIPA by collecting, capturing, and otherwise obtaining individuals' biometric identifiers and information, including the biometric identifiers and information of Plaintiff and Class Members, without providing the requisite written information and without obtaining the requisite written releases.

121.    Defendants' violations of BIPA were intentional and reckless or, pleaded in the alternative, negligent.

122.    As a direct and proximate result of Defendants' violations of BIPA, Plaintiff and Class Members have suffered and will continue to suffer injury.

123.    Plaintiff and Class Members seek as monetary relief the greater of $5,000 or actual damages or, pleaded in the alternative, $1,000 or actual damages.

124.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that their biometric identifiers and information can be viewed and used by unauthorized persons.  Plaintiff and Class Members have no adequate remedy at law for their

injuries in that a judgment for monetary damages will not end the misuse of Plaintiffs' and Class Members' biometric identifiers and information.

125.     Plaintiffs and Class Members also seek punitive damages, injunctive relief and the reasonable attorney's fees, costs and expenses relating to this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully requests that the Court enter an Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as Class Counsel;

B.     Declaring that Defendants' actions, as set out above, violate the BIPA;

C.     Awarding statutory damages for each of Defendants' violations of the BIPA, pursuant to 740 ILCS 14/20(1);

D.     Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including an Order requiring Defendants to collect, store, and use biometric identifiers or biometric information in compliance with the BIPA;

E.     Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.     Awarding such other and further relief as equity and justice may require.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Date:  March 25, 2022

/s/ Katrina Carroll
Katrina Carroll
Kyle A. Shamberg
**LYNCH CARPENTER LLP**
111 W. Washington Street - Suite 1240
Chicago, IL  60602
Phone: (312) 750-1265
Fax: (312) 212-5919
Email:     katrina@lcllp.com
                kyle@lcllp.com
Firm ID No. 63746
**ATTORNEYS FOR PLAINTIFF
AND THE PROPOSED CLASS**

36

## <u>CERTIFICIATE OF SERVICE</u>

Katrina Carroll, an attorney, certifies that on March 25, 2022, the foregoing was electronically filed with the U.S. District Court Clerk, Northern District of Illinois, Eastern Division, by using the CM/ECF filing system, which will send a notice of electronic filing to all CM/ECF participants.

<u>*/s/ Katrina Carroll*</u>
Katrina Carroll