IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARIO DZANANOVIC, individually and on behalf of all others similarly situated, ) ) ) Plaintiff, ) ) v. ) ) BUMBLE, INC., et al., ) ) Defendants. ) | No. 21-cv-06925 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dario Dzananovic, an Illinois resident, has brought this putative class action against Defendants Bumble, Inc., Buzz Holdings L.P. ("Buzz Holdings" or "Bumble Holdings"), and Bumble Trading LLC ("Bumble Trading") (collectively, "Defendants"), claiming that they violated Illinois's Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*. Specifically, Dzananovic alleges that Defendants used their facial recognition technology to collect his biometric information while he used the photo verification feature on the Bumble online dating application ("Bumble App" or "App"). Now before the Court is Defendants' motion to dismiss the complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (Dkt. No. 29.) For the following reasons, Defendants' motion is denied.

### BACKGROUND

When considering a motion to dismiss for lack of personal jurisdiction, any well-pleaded facts alleged in the complaint are taken as true and any factual disputes in affidavits are resolved in the plaintiff's favor. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The facts recited here are taken from Dzananovic's Amended Complaint ("Complaint"). The Court will address

the affidavits and other evidence the parties attached to their briefs, as appropriate, when discussing the parties' arguments below. *See Purdue Rsch. Found. v. Sanofi-Sunthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

As alleged, the Bumble App is a popular dating platform—with approximately 100 million registered users globally—on which women initiate contact with prospective dating partners. (Am. Compl. ¶¶ 3–5, Dkt. No. 21.) The App functions using "a freemium model," where certain services are free, but users must pay for subscriptions or in-app purchases to access premium features. (*Id.* ¶ 16.) In the third quarter of 2021, for example, the Bumble App generated $142.5 million in revenue from premium services. (*Id.*) Bumble, Inc. is an American social media company that formerly operated the Bumble App; it is now a holding company with a controlling equity interest in Buzz Holdings. (*Id.* ¶¶ 10–11.) Bumble, Inc. manages Buzz Holdings's business and affairs and controls Bumble Trading's operations. (*Id.* ¶¶ 12, 19.) While Bumble Holdings operates the Bumble App, Bumble Trading runs the marketing and advertising of the Bumble App in the United States and controls personal information collected and processed through the App. (*Id.* ¶¶ 19, 22, 24.) Bumble, Inc.'s main source of revenue from the App consists of users' subscriptions and in-app purchases. (*Id.* ¶ 12.) For instance, in the third quarter of 2021, the Bumble App had 1.5 million paying users, leading to $30.99 in average revenue per paying user. (*Id.* ¶ 34.) Defendants generate revenue from thousands of paying users in Illinois. (*Id.*)

Dzananovic is an Illinois resident who has used the Bumble App since March 2021. (*Id.* ¶ 9.) To use the Bumble App, users must provide personal identifying information ("PII"), including date of birth, location, gender identity, and sexual preference; Bumble then collects, retains, and uses the data for targeted marketing practices. (*Id.* ¶¶ 71–72.) Additionally, Bumble

2

has machine learning capabilities, allowing it to analyze users' behavioral information to personalize potential matches shown to users and to target users who are more apt to become paid members. (*Id.* ¶¶ 83–84.) Further, the App has an optional photo verification feature to help protect users from fake accounts. (*Id.* ¶¶ 74–75.) Defendants promote the photo verification feature as a way for users to "flirt, connect, and network comfortably, knowing the person you're talking to is exactly who they say they are." (*Id.* ¶ 36.) To verify an account, a user uploads a photograph mimicking a pose that the App provides, and the App subsequently reviews the photo and confirms or rejects the requested verification. (*Id.* ¶ 75.) In particular, the App uses an artificial intelligence tool to conduct a facial scan of the photo, extract geometric data from it, and then create a facial template. (*Id.* ¶ 76.)

BIPA regulates private entities' "collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g). According to Dzananovic, Defendants violated BIPA by failing to inform him and other Illinois residents that they were collecting, storing, and using their biometric information and identifiers when they used the Bumble App. As a result, Dzananovic has sued Defendants on behalf of himself and a class of similarly situated Illinois residents who "had their biometric information and/or biometric identifiers collected, captured, received, or otherwise obtained, or disclosed by Defendants while residing in Illinois." (*Id.* ¶ 113.)

## DISCUSSION

Defendants argue that the Complaint must be dismissed under Rule 12(b)(2) because the Court lacks personal jurisdiction over them.

When a defendant moves for dismissal under Rule 12(b)(2), "the plaintiff bears the burden of demonstrating that jurisdiction exists." *In re Sheehan*, 48 F.4th 513, 520 (7th Cir. 2022) (citation omitted). If the Court holds an evidentiary hearing, the plaintiff must establish

personal jurisdiction by a preponderance of the evidence; but when the Courts rules on a motion to dismiss without an evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022). The Court may consider affidavits and jurisdictional discovery to decide whether the plaintiff has made a *prima facie* case. *Purdue Rsch. Found.*, 338 F.3d at 782–83. In addition, the Court accepts as true all well-pleaded allegations in the complaint and resolves all factual disputes in the record in the plaintiff's favor. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). However, when the defendant "submit[s] evidence opposing the district court's exercise of personal jurisdiction, the plaintiff[ ] must similarly submit affirmative evidence supporting the court's exercise of jurisdiction." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). And the Court accepts as true any unrefuted facts in the defendant's supporting materials. *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

Generally, personal jurisdiction is governed by the law of the forum state. *Tamburo*, 601 F.3d at 700; Fed. R. Civ. P. 4(k)(1). Illinois's long-arm statute authorizes the exercise of personal jurisdiction to the full extent of the state and federal constitutions. *See* 735 ILCS 5/2-209(c). Consequently, "the state statutory and federal constitutional inquiries merge." *Tamburo*, 601 F.3d at 700 (citation omitted). The key question "is whether the exercise of personal jurisdiction over the defendants 'comports with the limits imposed by federal due process.'" *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 393 (7th Cir. 2020) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

The Court can exercise either general or specific personal jurisdiction over a defendant. *Sheehan*, 48 F.4th at 522. In this case, Dzananovic does not contend that the Court has general jurisdiction over these Defendants, so the Court limits its present inquiry to whether it has

4

specific jurisdiction. For the Court to exercise specific personal jurisdiction: (1) "defendants must have purposefully directed their activities at the forum state or purposefully availed themselves of the privilege of conducting business in the forum;" (2) "the alleged injury must arise out of or relate to the defendants' forum-related activities;" and (3) "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Id.* (citations omitted).

### I. Purposeful Direction or Purposeful Availment

The Court first considers whether Defendants purposefully directed their activities at Illinois or purposefully availed themselves of the privilege of conducting business in Illinois. The Court addresses each Defendant separately. *See Purdue Rsch. Found.*, 338 F.3d at 784 ("[E]ach defendant's contacts with the forum State must be assessed individually.").

#### A. Bumble Trading

As to Bumble Trading, Defendants argue that its alleged operation of the Bumble App and Illinois residents' unilateral use of the Bumble App does not constitute Bumble Trading expressly aiming or purposefully directing its conduct toward Illinois. Specifically, Defendants assert that the Bumble App is a globally accessible platform and the alleged collection of biometric information using the App's photo verification feature is not targeted at Illinois residents. Defendants appear to concede that Bumble Trading's purported marketing activities in Illinois constitute purposeful direction or purposeful availment, since they contend only that Dzananovic's BIPA claim does not arise from Bumble Trading's marketing activities in Illinois. Indeed, Defendants admit that Bumble Trading operates the Bumble App and that it has conducted marketing activities in Illinois as part of its nationwide advertising campaign for the Bumble App. (Defs.' Mem., Ex. 1, Rosas Decl. ¶¶ 13–14, Dkt. No. 30-1.)

Purposeful direction or purposeful availment "focus[es] on the acts and activities of the defendant," meaning that "specific personal jurisdiction cannot depend solely on the actions of the plaintiff or third parties." *Sheehan*, 48 F.4th at 522–23 (citations omitted). In essence, the defendant's contacts with the forum state must not be predicated on the "random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Id.* at 523 (quoting *Walden*, 571 U.S. at 286). Nonetheless, physical presence in the forum state is not required for the defendant to have sufficient minimum contacts with the forum state. *NBA Props.*, 46 F.4th at 624. And the Seventh Circuit has refused "to fashion a special jurisdictional test for Internet-based cases." *Curry*, 949 F.3d at 398 (citation omitted). That said, a defendant's mere operation or ownership of an interactive website that is just accessible in the forum state should not subject the defendant to jurisdiction, without the defendant targeting the forum state. *See id.* at 400. Yet "[a] defendant's deliberate and continuous exploitation of the market in a forum state, accomplished through its website as well as through other contacts with the state, can be sufficient to establish specific personal jurisdiction." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 446 (7th Cir. 2010).

The Seventh Circuit's decision in *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421 (7th Cir. 2010), is instructive here. In *uBID*, a federal district court in Illinois had dismissed an action against the operator of the domain name registration website GoDaddy for lack of personal jurisdiction. *Id.* at 425. In reversing the lower court's dismissal, the Seventh Circuit found that the district court did have personal jurisdiction over the defendant, citing "extensive marketing in Illinois and sales to Illinois customers." *Id.* at 427. In a nutshell, the Seventh Circuit concluded that the defendant had deliberately exploited the Illinois market via its sales and advertisements to Illinois, even though it did not specifically target Illinois customers in its advertising. *Id.* at

6

427–28; *see also be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011) (describing the defendant in *uBID* as "massive[ly] and successful[ly]" exploiting the Illinois market "through an advertising campaign that produced hundreds of thousands of customers in the state and millions of dollars in annual revenues"). Further, the Seventh Circuit rejected the defendant's argument that its sale of domain names to Illinois customers were transactions unilaterally initiated by the customers since it "itself set the system up this way." *uBID*, 623 F.3d at 428–29.

Similarly, here, the Court finds that Bumble Trading purposefully availed itself of the Illinois market for its dating app services by deliberately and continuously exploiting that market. Defendants do not challenge Dzananovic's allegation that the Bumble App generates revenue from thousands of paying users who are Illinois residents. (*See* Am. Compl. ¶ 34.) To put a figure to this potential revenue amount, in the third quarter of 2021, the Bumble App is alleged to have had an average revenue of $30.99 per paying user. (*Id.*) In addition, Bumble Trading has a nationwide advertising campaign for the Bumble App (Rosas Decl. ¶ 14), and has conducted extensive marketing in Illinois (*see* Am. Compl. ¶¶ 39–50). For instance, Bumble Trading has advertised the Bumble App on physical billboards in Chicago, launched verified physical locations in Chicago called "BumbleSpot[s]" where people can meet their matches and mingle safely, offered "DiningOut Passbooks" to users in Chicago, hosted happy hour events in Chicago for individuals with Bumble profiles, conducted prize drawings for free dates for Chicago users, sponsored booths at Chicago's Lollapalooza festival, promoted and advertised success stories of couples from Chicago who met on the App on their website, and employed campus ambassadors at universities in Chicago to market and promote the app on their campuses. (*Id.* ¶¶ 39–50.) Moreover, Bumble Trading does not dispute Dzananovic's assertion that it collects PII from users for targeted marketing purposes, including to personalize potential

7

matches, inform its product pipeline, and identify users who are likely to become paying users. (*Id.* ¶¶ 71, 83.)

Defendants attempt to distinguish *uBID* from the present case on the grounds that Bumble Trading does not sell or ship products or services to Illinois residents, and that any subsequent steps after the user downloads the App are user-driven, including using the photo verification feature. These arguments are unpersuasive. As an initial matter, notwithstanding Defendants' selective quotations, the Seventh Circuit in *uBID* did not hold that internet sales could not be described as unilateral if the seller took significant steps both before and after sales; instead, it summarized a previous ruling in another case in support of the well-taken observation that a defendant cannot set up a system so that customers in a state can take advantage of the defendant's services and then suggest that the customers' decisions to do so (with millions of dollars flowing to the defendant as a result) was "all their idea." *See uBID*, 623 F.3d at 428 ("*See State of Illinois v. Hemi Group*, 622 F.3d at 758–59 (misleading to describe internet sales as 'unilateral' on part of customers where seller took significant steps both before and after sales)."). In any case, *uBID* should not be interpreted as narrowly as Defendants suggest, as the main point from the case is that the defendant had exploited the Illinois market through its advertising campaign and significant revenue from sales to its numerous Illinois customers. *See NBA Props.*, 46 F.4th at 622 (describing *uBID*'s holding); *be2 LLC*, 642 F.3d at 559 (same). And moreover, Bumble Trading's alleged collection and use of users' PII for targeted marketing refutes Defendants' argument that all the interactions after the user downloads the App are user-driven.

In sum, Dzananovic has made a sufficient showing that Bumble Trading purposefully directed its activities toward Illinois and purposefully availed itself of the Illinois market. *Cf.*

8

*Chien v. Bumble Inc.*, No. 3:22-cv-00020-GPC-NLS, 2022 WL 17069842, at *8–9 (S.D. Cal. Nov. 17, 2022) (determining that Bumble Trading continuously and deliberately exploited the California market because the Bumble App was highly interactive, Bumble generated revenue from thousands of paying users in California, Bumble Trading collected personal and location information from California users to send targeted marketing and promotions, and the Bumble App has forum-specific content such as displaying other users within the forum).

### B. Bumble, Inc. and Buzz Holdings

Turning to Bumble, Inc. and Buzz Holdings, Defendants contend that those entities did not purposefully direct their activities toward Illinois because they are holding companies that do not conduct any operating business whatsoever.

In the Complaint, Dzananovic alleges that Bumble, Inc. owns and operates the Bumble App, derives revenue from the App, directs and controls the operations of Bumble Trading, is a party to the App's terms and conditions, and is involved in the marketing of the App. (*See* Am. Compl. ¶¶ 14–16, 19, 21, 39–51.) As to Buzz Holdings, Dzananovic also alleges that Buzz Holdings operates the Bumble App, derives revenue from paying users on the App, and is involved in the marketing of the App. (*See id.* ¶¶ 22, 34, 39–51.) Defendants, in turn, contest those allegations and offer in support Bumble Inc.'s filings with the Securities and Exchange Commission ("SEC") and corporate governance guidelines as well as a declaration from Christopher Rosas, Bumble Trading's Vice President of Tax and Treasury. Rosas states that Bumble Inc. and Buzz Holdings are holding companies that do not conduct any operating business, that they do not generate any revenue from Illinois or elsewhere, that they do not market the Bumble App, that they do not control or operate the Bumble App, and that they do not collect or store information from Bumble App users. (*See* Rosas Decl. ¶¶ 6, 9–12.)

9

Defendants further assert that the SEC filings do not state that Buzz Holdings and Bumble Inc. operate the Bumble App.

Conversely, Dzananovic points to a declaration in a separate litigation from Caroline Roche, Bumble Trading's Chief of Staff in 2021, where she states that Bumble, Inc. is the parent company of Bumble Trading, is involved in the marketing decisions of its subsidiaries, and is a party to the Bumble App's terms and conditions. (Pl.'s Resp. Br., Ex. A, Roche Decl. ¶ 3, Dkt. 34-1.) Additionally, despite Defendants' protestations to the contrary, the SEC filings specifically describe Buzz Holdings and Bumble Inc. as "providing online dating and social networking platforms through subscription and credit-based dating products" through "websites and applications that it owns and operates." (Defs.' Reply Br., Ex. A, 2020 SEC 10-K Filing at 85, Dkt. No. 36-1; Defs.' Reply Br., Ex. C, 2021 SEC 10-K Filing at 88, Dkt. No. 36-3.) The SEC filings further note that Bumble operates the Bumble App, Bumble conducts brand marketing and field marketing such as sponsorships and brand ambassadorships, and Bumble employs machine and deep learning to personalize user matches and inform its product pipeline. (2020 SEC 10-K Filing at 9–10, 12, 24, 54; 2021 SEC 10-K Filing at 9–10, 12, 24.) While Defendants claim that those statements do not refer to Bumble, Inc. or Buzz Holdings, the filings define "Bumble" or "[W]e" as referring to "Bumble, Inc. and its consolidated subsidiaries." (2020 SEC 10-K Filing at 5; 2021 SEC 10-K Filing at 5.) Without any additional information, those statements describing Bumble's activities plausibly include Bumble, Inc. and Buzz Holdings.

Resolving factual disputes in the filings and declarations in Dzananovic's favor for present purposes, Bumble, Inc. and Buzz Holdings have a role in the operation and marketing of the Bumble App and leveraging of user data for targeted marketing. Thus, for the same reasons

10

as with respect to Bumble Trading, the Court concludes that Bumble, Inc. and Buzz Holdings purposefully availed themselves of the Illinois market and purposefully directed their activities toward Illinois. *Cf. Chien*, 2022 WL 17069842, at *9–10 (finding personal jurisdiction at the motion to dismiss stage and concluding that Bumble, Inc. purposefully directed its activities toward California in its capacity as a parent corporation and was involved in operating, developing, marketing, and controlling the Bumble App in light of the Roche declaration and SEC filings).[1]

## II.     "Arise Out of" or "Relate to" Defendants' Forum Contacts

The Court next addresses whether Dzananovic's claim arises out of or relates to Defendants' forum-related activities. Defendants argue that Dzananovic's BIPA claim, which pertains to Defendants' alleged collection of his biometric information through the Bumble App's photo verification feature, does not arise out of or relate to Bumble Trading's marketing of the App.

A "defendant's minimum contacts with the forum state [must] be suit-related." *Curry*, 949 F.3d at 400 (internal quotation marks and citation omitted). But a strict causal connection between the defendant's in-state activity and the plaintiff's suit is not required. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021); *see also NBA Props.*, 46 F.4th at 626 n.18 (noting that the Supreme Court in *Ford* rejected a direct causal inquiry for the "arising out of or related to" requirement of specific jurisdiction). While the "arise out of" prong "asks about causation," the "relate to" prong "contemplates that some relationships will support

---

[1] With respect to Buzz Holdings, the court in *Chien* found that it did not have specific jurisdiction over it because the plaintiff's complaint raised allegations against Bumble Holding Limited of the United Kingdom and ***not*** Buzz Holdings, despite the plaintiff confusingly identifying Buzz Holdings as a defendant in the case caption. *Chien*, 2022 WL 17069842, at *5, *7.

jurisdiction without a causal showing." *Ford*, 141 S. Ct. at 1026 (holding that the plaintiffs' product liability claims regarding injuries from defective vehicles were closely related to the defendants' systematic servicing of the markets for those vehicles in the forum states, despite defendants not designing or manufacturing the vehicles in those states). That said, the "relate to" prong "incorporates real limits," such that not just any relationship will suffice. *See id.* Simply put, "due process requires only that the relationship among the defendant, the forum[s], and the litigation—is close enough to support specific jurisdiction." *NBA Props.*, 46 F.4th at 626 n.18 (quoting *Ford*, 141 S. Ct. at 1032 (citation omitted)).

Defendants cite *Gullen v. Facebook.com, Inc.*, No. 15 C 7681, 2016 WL 245910 (N.D. Ill. Jan. 21, 2016), for their contention that a defendant's marketing and sales activities in a forum state are unrelated to allegations of unlawful collection of biometric data in violation of BIPA. In *Gullen*, the plaintiff alleged that Facebook.com, Inc. violated BIPA by obtaining his biometric data from a photo of him on the website using its "tag suggestion feature." *Id.* at *1. The court determined that although the defendant maintained a sales and advertising office in Illinois, that contact had no relationship to the plaintiff's suit, which arose from the defendant's "alleged collection of biometric data from a photo, not from its sales, marketing, or other business activity in Illinois." *Id.* at *2. But *Gullen* is readily distinguishable from the allegations here. Notably, *Gullen* is a pre-*Ford* decision and, in any case, it would not be controlling precedent for this Court. Additionally, Defendants' forum-related activities are not limited just to marketing the Bumble App in Illinois; rather, their forum-related activities also include exploitation of the Illinois market for dating app services through its thousands of paying customers in Illinois and resulting revenue. Further, the "tag suggestion feature" at issue in *Gullen* had nothing to do with the marketing and advertising of the defendant's platform.

12

By contrast, there is a substantial connection between Defendants' marketing activity and exploitation of the Illinois market and their alleged collection of biometric data via the "optional" photo verification feature.[2] According to Dzananovic, Bumble is known for providing users greater privacy and safety than comparable dating apps. (Am. Compl. ¶¶ 4–5.) Based on Dzananovic's allegations, the photo verification feature is part of Defendants' marketing strategy for the Bumble App and how they attract users. In particular, Defendants promote the feature as a way for users to connect with their matches comfortably, catch fake profiles, and to ensure that the person that they matched with is actually that person. (*See id.* ¶¶ 29, 36.) Indeed, in Defendants' SEC filings, they emphasize that they "were among the first major dating apps to introduce automated photo verification as a safety feature." (2020 SEC 10-K Filing at 9; 2021 SEC 10-K Filing at 9.)

At its core, Dzananovic's suit is about Defendants deployment of the Bumble App's photo verification feature to collect his biometric information, which relates to Defendants' marketing of the Bumble App and its efforts to exploit the Illinois market for dating app services, because the feature is a means to entice users to the platform. *Cf. Kukovec v. Estee Lauder Cos., Inc.*, No. 22 CV 1988, 2022 WL 16744196, at *1, *4 (N.D. Ill. Nov. 7, 2022) (concluding that the plaintiff's BIPA suit—which alleged that the defendant's optional makeup try-on tool on its website collected her facial-geometry data—related to the defendant's sale of cosmetics in Illinois because the virtual try-on tool was part of the defendant's sales and marketing of its cosmetics); *uBID*, 623 F.3d at 430–31 (finding that the defendant's Illinois contacts related to the plaintiff's claims because the defendant reached its thousands of customers in Illinois with its

---

[2] It is unclear whether the photo verification feature is fully optional. Although Dzananovic alleges that use of the feature is optional yet encouraged, he also asserts that Defendants occasionally require users to verify themselves by providing a photo of themselves. (Am. Compl. ¶¶ 29, 75.)

13

advertising by offering "free parking of a registrant's domain name" and the plaintiff alleged that the defendant used free parked pages with bad-faith intent to profit from the plaintiff's trademarks). Defendants have presented no authority suggesting that marketing activity in the forum state must specifically mention a specific feature or benefit of a platform, such as the photo verification feature, for a connection to exist between the marketing activity and the plaintiff's claim—especially when the feature is promoted nationally.

Accordingly, the Court determines that Dzananovic's BIPA claim relates to Defendants' forum activities.

### III.    Traditional Notions of Fair Play and Substantial Justice

Finally, the Court considers whether exercising jurisdiction over Defendants would offend traditional notions of fair play and substantial justice. Defendants argue that this Court exercising jurisdiction over Defendants in Illinois would be unreasonable for three main reasons: (1) Defendants are entities formed under the laws of Delaware with their principal places of business in Texas; (2) the Bumble App is available worldwide and Bumble Trading conducts the same marketing activities in Illinois as it does in other states; and (3) none of the Defendants have offices or property in Illinois.

In evaluating the fairness factor, courts assess: the "burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the underlying dispute, and the shared interest of the several States in furthering fundamental substantive social policies." *NBA Props.*, 46 F.4th at 627 (citations omitted). If the defendant has purposefully directed his activities at the forum state, "he must present a ***compelling case*** that the

14

presence of some other considerations would render jurisdiction unreasonable." *Id.* (emphasis added) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Here, the Court finds that exercising jurisdiction over Defendants would not be unreasonable or unfair. Other than being out-of-state defendants, Defendants do not claim any unusual burden in defending suit in Illinois. In addition, Defendants are multi-million-dollar entities with global reach, which militates against a finding of unfairness. *Cf. Curry,* 949 F.3d at 402 (finding that the burden on the defendant to defend a suit in Illinois was minimal, despite the defendant's lack of physical presence in Illinois, because it structured its marketing and nationwide business model to easily serve Illinois consumers); *uBID*, 623 F.3d at 432 (noting that the defendant had a minimal burden in defending suit since it was a sophisticated corporation with a national reach); *Illinois v. Hemi Group LLC*, 622 F.3d 754, 760 (7th Cir. 2010) (concluding that exercising jurisdiction over the defendant was fair where the defendant had established an "expansive, sophisticated commercial venture online," "held itself out to conduct business nationwide," and succeeded in "reaching customers across the country"). Further, Illinois has an interest in providing a forum for its residents, such as Dzananovic and other class members, to seek redress for the collection of their biometric information in violation of BIPA, an Illinois statute.

Defendants rely on *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014), for the proposition that it would offend traditional notions of fair play and substantial justice to subject a defendant with an interactive website to personal jurisdiction in every state where that website is accessible. As discussed above, however, Defendants have done more than just make the Bumble App accessible in Illinois;

15

specifically, Defendants have used the Bumble App to purposefully avail itself of the Illinois market and have conducted targeting marketing in Illinois.

Therefore, the Court concludes that exercising personal jurisdiction over Defendants comports with traditional notions of fair play and substantial justice.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 29) is denied.

ENTERED:

Dated: July 7, 2023

Andrea R. Wood
United States District Judge